Kara Kathleen HUFFMAN et al. *v.* John Nicholas FISHER

CA 97-1493 976 S.W.2d 401

Court of Appeals of Arkansas
Divisions I and IV
Opinion delivered October 14, 1998

*Shaver & Smith, P.A.*, by: *Tom B. Smith*, for appellants.

*Killough & Ford*, by: *Robert M. Ford*, for appellee.

SAM BIRD, Judge. Appellant Kara Huffman, a minor, and her parents, appellants William H. and Kathryn Huffman, as Guardians of the Person of Jacob Auston Huffman, a minor,

appeal a decision of the Cross County Chancery Court that changed the name of Kara's baby from Jacob Auston Huffman to Jacob Auston Fisher. The father of the baby is John Nicholas Fisher. We affirm the decision of the chancellor.

Kara Huffman and John Nicholas Fisher (Nick) had been involved in a long-term relationship when Kara became pregnant in 1995. At trial, Kara testified that Nick, a high-school senior, urged her not to tell anyone about the pregnancy and said that he wanted her to have a secret abortion. Kara said Nick teased her about being fat and was angry when she refused to have an abortion. Soon after Kara's parents found out about the pregnancy, Nick told his parents. The Fishers then sought a meeting with the Huffmans, who did not want Nick and Kara present, and the parents met without Nick and Kara. The Fishers offered to, and did, assist in paying for the birth of the child. On May 18, 1996, Jacob was born six weeks premature in a hospital in Forrest City and had to be transferred to a hospital in Memphis. Although Nick acknowledged paternity, Kara did not give the baby Nick's last name. Nick and Kara went separately to Memphis every day to see him. In the fall, Nick went to college in Russellville. Nick and Kara did not marry.

On August 9, 1996, the State of Arkansas, Office of Child Support Enforcement, as Kara's assignee of child-support benefits, filed suit to collect child support. In his answer, Nick acknowledged paternity and, by third-party complaint against appellants, asked the court to set an appropriate amount of child support to be paid by him, to grant him reasonable visitation and establish a specific schedule of visitation, and to order that the child's birth certificate be corrected to reflect the name of the child to be Jacob Auston Fisher. After a hearing, the chancellor entered an order on May 19, 1997, in which he found that Nick was the child's father and set child support and visitation. The issue of Jacob's last name was reserved, and on June 3, 1997, the chancellor issued a letter opinion in which he held that there was a compelling reason to change Jacob's last name to Fisher and so ordered. A formal order directing that the child's name be changed was entered on July 14, 1997. From that order comes this appeal.

Appellants argue that (1) the court erred in finding that the surname of the baby should be changed from that of the mother and custodial parent to that of the father, the father having failed to present any compelling facts that show it would be in the best interests of the baby to change the surname he has carried since birth; and (2) the best interests rationale adopted by the court in *Reaves v. Herman*, 309 Ark. 370, 830 S.W.2d 860 (1992), and in *McCullough v. Henderson*, 304 Ark. 689, 804 S.W.2d 368 (1991), should be clarified to adopt a presumption in favor of the surname chosen for a child by the child's custodial parent.

 Upon *de novo* review of a chancery court decision, a chancellor's findings are not disturbed unless they are clearly erroneous or clearly against the preponderance of the evidence. *Stone v. Steed*, 54 Ark. App. 11, 923 S.W.2d 282 (1996). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake had been committed. *Duckworth v. Poland*, 30 Ark. App. 281, 785 S.W.2d 472 (1990).

At the hearing Nick admitted that he was upset when he found out that Kara was pregnant, that he may have asked Kara not to tell anyone about the pregnancy, that he had suggested she have an abortion, and that he did not tell his parents about the baby until a couple of months before he was born. He testified that he wanted the child to have his surname because he grew up with his dad's name and he did not believe that he should be treated differently just because his son was born out of wedlock. He also insisted that he wanted to pay child support and all of the medical expenses, be involved in the decisions relating to Jacob's upbringing, have regular visitation, and do the things that all fathers do.

Nick's mother, Janet Fisher, testified that she was willing to take any action on Nick's behalf the court ordered as long as Nick was in college. When asked why she wanted the baby's name changed to Fisher, she said:

> Nick is his father and he comes from a very proud family. We're all proud of who we are. This baby will always be — Nick will always be his father and he will always be Nick's son, and we

feel like his name should always be Fisher. Nick's father was a Fisher and his grandfather was a Fisher and we want this baby to be a Fisher so that his children can be Fishers.

Mrs. Fisher also testified that Nick and his entire family adored and loved the baby, that they visited with him in their home every other Saturday from 10 a.m. to 6 p.m. and that Jacob was considered a part of their family.

Nick's father also testified that he offered to pay more of the expenses of the birth and to start paying child support for his grandson, but the Huffmans had refused his offer. On cross-examination, Mr. Fisher said he wanted Jacob's last name changed to Fisher because it was usual and customary for a child to have his father's last name.

Kara testified that after the baby was born she had no relationship whatsoever with Nick, that there was no way possible there would ever be one again, and she objected to prolonged visitation while Jacob was so young.

On appeal, appellants first argue that the chancellor erred in finding that Jacob's surname should be changed because there was no compelling evidence that it would be in the best interest of the child. Arkansas Code Annotated section 20-18-401(f) (Supp. 1997) provides:

> (2) If the mother was not married at the time of either conception or birth or between conception and birth, the name of the father shall not be entered on the certificate of birth without an affidavit of paternity signed by the mother and the person to be named as the father. The parents may give the child any surname they choose.
>
> (3) In any case in which paternity of a child is determined by a court of competent jurisdiction, the name of the father and surname of the child shall be entered on the certificate of birth in accordance with the finding and order of the court.

In *Reaves v. Herman*, 309 Ark. 370, 830 S.W.2d 860 (1992), in which the parents of the baby were seventeen, the father was initially angered by the mother's pregnancy and unwilling to accept the baby until sometime after its birth. The mother had

given the baby her surname. Some months later the father filed a petition for the establishment of paternity, to have the surname of the baby changed to his surname, for division of the birth expenses, future medical expenses, support, and visitation. The chancellor refused to change the surname of the child to that of its biological father. The Arkansas Supreme Court affirmed, stating that there were no compelling facts that showed it would be in the best interest of the nine-month-old child to change the surname he had carried since birth.

In *Mathews v. Oglesby*, 59 Ark. App. 127, 952 S.W.2d 684 (1997), the father had offered no financial support during the pregnancy, was in arrears in child support, and did not show up for his first two visitations. We are not told the ages of the parents, but the father was able to pay $400-a-month car payments, indicating someone at least older than high-school age. The chancellor announced early in the presentation of the case:

> It has been this Court's policy to change the last name to that of the father unless it is a situation where the child is, let's say, ten or eleven years old, been in school for a number of years, everybody knows that child by that last name. We're talking about an infant here. So in all likelihood the Court is going to change the last name.

We held that the chancellor's policy considered only the age of the child, that the "mechanical application of such a policy precludes consideration of the full panoply of factors inherent in determining the best interest of a child," and that "[W]hen the best interests of the child are involved, the chancellor should make his or her decision on an individualized basis, not on the basis of a presumption." 59 Ark. App. at 130, 952 S.W.2d at 686.

Appellants rely heavily upon the *Reaves* case, pointing out the almost identical facts and arguing that if the supreme court found no compelling facts to change the baby's name to that of the father in *Reaves*, then the chancellor in this case abused his discretion by changing Jacob's name to Fisher. Appellants also point out additional factors in support of their position: Kara has sole custody of the child and is his complete caretaker while also continuing her schooling; appellee encouraged appellant to have a secret

abortion; appellee gave no financial assistance to Kara during the pregnancy; appellee gave no emotional assistance, and in fact, ridiculed Kara during the pregnancy about her weight gain; and appellee has not attempted to continue any kind of relationship with Kara since his son's birth.

■ Changing the name of a child is a matter in which the chancellor has broad discretion. *McCullough v. Henderson, supra.* In *Clinton v. Morrow,* 220 Ark. 377, 247 S.W.2d 1015 (1952), a case in which the natural father objected to his children's names being changed to the surname of their stepfather, the Arkansas Supreme Court said:

> We have no statute requiring the consent of both parents to change the name of an infant. Under the facts here presented, we hold that the question of the right and propriety of the children's use of the surname of their stepfather is one that rests in the sound discretion of the chancellor. In view of the natural and commendable desire of the father to have his children bear and perpetuate his name, this discretion should be exercised with the utmost caution and such use or change should not be sanctioned unless it is for the best interests of the children.

220 Ark. at 383, 247 S.W.2d at 1018. More recently, in *Mathews v. Oglesby, supra,* we cited *McCullough, supra,* and said:

> [T]he decision to change or not change the child's surname should be "the product of the chancellor's informed discretion, exercised in response to what is deemed to be in the best interests of the child." When the best interests of the child are at stake, the chancellor should look into the peculiar circumstances of each case and act as the welfare of the child appears to require.

59 Ark. App. at 130, 952 S.W.2d at 686.

The chancellor has done exactly that in this case. In a six-page[1], single-spaced, twenty-paragraph letter opinion, the chancellor carefully reviewed the evidence presented at the hearing and

---

[1] For unexplained reasons, page four of the chancellor's opinion letter was omitted from the record as well as from the copy of it that was attached as an exhibit to appellees' brief. However, because of the lack of continuity between the end of page three and the beginning of page five of the letter, it is apparent that the original letter did, in fact, contain a page four.

pointed to the factors that he considered to be most significant and persuasive to him in the formulation of his conclusion that it would be in Jacob's best interest to bear the surname of his father. In his letter, the chancellor opined,

> I believe that [Nick] and his family will take a very active interest in the childhood development of Jacob and that Jacob will have every opportunity to know his father and his father's family. I believe that this will not be a situation in which the mother and her family raises a child without the help, care, love, and support of the father's family. This being the case, the child will know his father and his father's family and a surname of Fisher will not [be] awkward for him. I believe that any other scenario would be awkward. A child needs a surname that he can connect with for a lifetime; taking the surname of the mother opens up too many opportunities for the child to be later left without that connection[.]

The chancellor also said it was the "norm" in Cross County for the child to have the surname of its father; and that "What is of importance to this court is that Jacob have a surname that he is most likely to be able to connect with one of his parents. The most likelihood of that happening is for Jacob to have the surname of Fisher."

The dissent states that "the real issue here is whether Jacob's best interests will be served by changing his name to that of his father, or whether those interests will be better served by retaining his mother's name . . . ." We do not agree. It is true that the determination of the child's best interests was the issue the chancellor had to decide, but the issue on appeal is whether we believe the chancellor abused his discretion by basing his decision on findings that are clearly erroneous or clearly against the preponderance of the evidence. In making that determination, we do not substitute our judgment for that of the chancellor and retry the case as if no decision had been made below.

From his findings, it is clear to us that the chancellor considered the "full panoply of factors inherent in determining the best interests of a child," that he has carefully considered the "peculiar circumstances" of this case, *Mathews v. Oglesby, supra,* and that he has pondered at length the ramifications of his deci-

sion. We believe that his conclusions are rationally related to the evidence revealed by the record, and we are not convinced that they are clearly erroneous. Under these circumstances, we are simply not able to say that the chancellor abused his discretion in concluding that the child's surname should be that of his father.

■ Appellants also argue that the best-interest rationale adopted in *Reaves* and *McCullough* should be clarified by this court to adopt a presumption in favor of the surname chosen for a child by the child's custodial parent. In support of this position, they rely on and quote extensively from *Gubernat v. Deremer*, 140 N.J. 120, 657 A.2d 856 (1995). We rejected an identical request in *Mathews v. Oglesby, supra*, and said, "When the best interests of the child are involved, the chancellor should make his or her decision on an individualized basis, not on the basis of a presumption."

Affirmed.

JENNINGS and CRABTREE, JJ., agree.

AREY, NEAL, and MEADS, JJ., dissent.

MARGARET MEADS, Judge, dissenting. I am deeply troubled by the affirmance of the trial court's decision in this case, not only because I believe it is not in the child's best interests to change his surname but also because it unfairly subverts Kara Huffman's ability to name her child. The real issue here is whether Jacob's best interests will be served by changing his name to that of his father, or whether those interests will be better served by retaining his mother's maiden name, which he has now held for twenty-nine months.[1]

Kara Huffman faced painfully difficult circumstances when her son, Jacob Auston Huffman, was born: she was seventeen years old, still in high school, and unmarried, with a premature infant who required hospitalization. Although she had had an eighteen-month relationship with the child's father before she became pregnant, he had not only encouraged her to abort the pregnancy but

---

[1] The trial court granted appellant's petition to stay the order changing Jacob's surname on his birth certificate until the decision has been reviewed by the appellate courts.

had also ridiculed her as she grew larger, and she knew that the relationship was over. Fortunately, she had the love and nurture of her mother and father, who welcomed the infant into their family's home. Four months after Jacob's birth, appellee sought an order to "correct" the birth certificate, claiming that the certificate reflects the child's name to be Jacob Auston Huffman, when in fact the child's "lawful" name is Jacob Auston Fisher. Kara opposed this, stating in her response: "[John N. Fisher] has exhibited contempt, rudeness, and utter disregard for the parental rights of Kara Huffman . . . . The birth certificate was not erroneously entered reflecting the name, and the child's correct and lawful name is Jacob Auston Huffman."

At the hearing, Kara testified that it was her decision to use the last name of Huffman on the birth certificate. As abstracted by appellants, Kara testified:

> It was my decision to use the last name of Huffman on the birth certificate. Jacob was going to be raised in my family, around my brothers and sisters. He's going to be raised with me his whole life, and I think it's important he has my name. I'm going to be the one raising him. Even when I get married, I can keep my name Huffman and he'll have the same name as me. I don't mind doing that. It's for Jacob. I think it's in his best interests to keep it Huffman.

Clearly, Kara had given careful thought to her son's best interests and their future.

In remarkable contrast to Kara's selflessness, appellee testified that the main reason he wanted Jacob's name on the birth certificate changed to Fisher was because that was how he grew up, with his father's name. Although he admitted that his parents were married to each other, he did not think he should be treated differently merely because he had a child out of wedlock. On cross-examination, appellee was questioned about any other reasons he might have for wanting to change Jacob's name. As abstracted by appellants, appellee testified:

> I want the name changed from Huffman to Fisher because I grew up with my dad's name. Unless she doesn't get married, her last name's going to change. I'm always going to be Fisher. As far as

> the child being raised in the Huffman home, I think he would be better labeled with a different name.

Similarly, appellee's father, William M. Fisher, Sr., testified, according to appellant's abstract, as follows:

> I think my grandson's name should be Fisher. When Nick is at baseball games and somebody asks him if any of his kids are playing and he tells them "Jacob Huffman," it's kind of awkward to explain why he's got his mother's name instead of his father's. . . . My feeling is that his name should be changed because it would be awkward for Nick. It's usually customary that the child have the father's name. It would be awkward to explain to everybody. The question would probably never come up for the mother as to why the child's name were Fisher but she was never married to the father.

Incredibly, appellee thought his child "would be better labeled with a different name." It defies credulity to think that a child raised in the home of six family members named "Huffman" would be better off with the name "Fisher." Moreover, it defies my sense of compassion to consider the "awkwardness" that Nick might feel when he explains that his son bears his mother's surname, and the reason why.

It is the best interests of the child, not the father or his family, that must guide our decision. When the best interests of the child are at stake, the chancellor should look into the peculiar circumstances of each case and act as the welfare of the child appears to require. *See Reaves v. Herman*, 309 Ark. 370, 830 S.W.2d 860 (1992); *McCullough v. Henderson*, 304 Ark. 689, 804 S.W.2d 368 (1991); *Matthews v. Oglesby*, 59 Ark. App. 127, 952 S.W.2d 684 (1997). Though we review chancery cases *de novo* on appeal, we will not reverse the findings of fact of a chancellor unless the decision was clearly erroneous. *Riley v. Riley*, 61 Ark. App. 74, 964 S.W.2d 400 (1998). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Duckworth v. Poland*, 30 Ark. App. 281, 785 S.W.2d 472 (1990). After reviewing the record in this case, I am firmly convinced that the chancellor was clearly erroneous in ordering that Jacob's name be changed to Fisher.

Other jurisdictions have recognized that an unwed father does not have superior rights to have his child carry his surname. In *Barabas v. Rogers*, 868 S.W.2d 283 (Tenn. App. 1993), the court reviewed the evolution of the use of surnames in English history, stating in summary:

> The common law recognized that unmarried mothers obtained their parental rights by giving birth to the child, while fathers obtained their parental rights through marriage. It followed that unmarried mothers possessed greater parental rights than did putative fathers, and in fact, some commentators stated that fathers had no rights with regard to their nonmarital children. Accordingly, it became customary for nonmarital children to assume their mother's surname at birth rather than their father's . . . . [N]either custom nor the common law recognized a father's right to have his nonmarital children bear his surname. (Citations omitted.)

*Id.*, at 286-87. Further, in *Daves v. Nastos*, 711 P.2d 314 (Wash. 1985), the trial court entered an order changing the surname of a child born out of wedlock from the mother's to the father's surname, without entering any specific findings that a name change was in the child's best interests. On appeal, the trial court's order was vacated and the case remanded for a hearing to determine whether the child's best interests would warrant making such a change. The court stated:

> A change in surname, so that a child no longer bears the name of a custodial parent, not only is of inherent concern to the custodial parent but is, in a real sense, a change in status having significant societal implications. Once a surname has been selected for a child, be it the maternal, paternal, or some combination of the child's parent's surnames, a change in the child's surname should be granted only when the change promotes the child's best interests.

*Id.*, at 318.

In his order granting the name change to Fisher, the chancellor reasoned:

> With the father being active in Jacob's life, Jacob will know that his surname is different from his father's. Although this happens often, it is not the norm in this locale. The norm in this locale is

> that the child will have the same surname as the father. Whether that is right or wrong, that is the norm in this locale.

This reasoning is virually the same as the announced "policy" of the chancellor in *Mathews, supra,* to wit: "It has been this court's policy to change the last name to that of the father unless it is a situation where the child is, let's say, ten or eleven years old, been in school for a number of years, everybody knows that child by that last name." The court of appeals reversed the chancellor in *Mathews,* finding that the mechanical application of a "policy" that only took into account the child's age precluded consideration of the full panoply of factors inherent in determining the best interests of a child. Here, the chancellor's focus on "the norm in this locale" is commensurate with a policy of automatically assigning a child his father's surname.

I do not believe there are compelling facts which make it imperative to change Jacob's surname, and I do not believe it is in Jacob's best interests to do so. In my opinion, the significant considerations are that it is Kara Huffman who has custody of Jacob, it is she who is his primary caretaker, and it is she who will make major decisions for him as he grows up. Moreover, as a result of the decision of the prevailing judges, it is Jacob who will deal with awkwardness when his mother enrolls him in school and he tries to understand why his name is not the same as hers. I do not believe there are more compelling facts in this case than there were in *Reaves, supra,* wherein our supreme court announced it was not in the minor child's best interests to change the surname he had carried since birth. I would therefore reverse the chancellor and restore the child's birth name.

Because this court has reached a tie vote in this case, the trial court's decision must be affirmed. Ark. Code Ann. § 16-12-113 (Repl. 1994). It would be instructive for appellants to seek a review of this decision in our supreme court. Ark. Sup. Ct. R. 1-2(e)(i).

NEAL and AREY, JJ., agree.